# United States Court of Appeals for the Federal Circuit

———————————

**DEBRA JONES, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF TODD R. MURRAY, DECEASED, FOR AND ON BEHALF OF THE HEIRS OF TODD R. MURRAY, ARDEN C. POST, INDIVIDUALLY AND AS THE NATURAL PARENTS OF TODD R. MURRAY, UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2015-5148

———————————

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00227-MBH, Judge Marian Blank Horn.

———————————

Decided: January 27, 2017

———————————

JEFFREY S. RASMUSSEN, Fredericks Peebles & Morgan LLP, Louisville, CO, argued for plaintiffs-appellants. Also represented by FRANCES C. BASSETT.

JAMES MAYSONETT, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JOHN C. CRUDEN.

———————————

Before LOURIE, O'MALLEY, and TARANTO, *Circuit Judges.*

O'MALLEY, *Circuit Judge*

Debra Jones, Arden C. Post, and the Ute Indian Tribe of the Uintah and Ouray Reservations (collectively, "Jones"), appeal the judgment of the United States Court of Federal Claims ("CFC") dismissing (1) Jones's claims for damages against the United States for failure to state a claim under the 1868 Treaty between the United States and the Ute Tribe, and (2) a breach of trust claim for failure to state a claim under the 1868 Treaty and an 1863 Treaty between the same parties. *Jones v. United States*, 122 Fed. Cl. 490 (Fed. Cl. 2015) ("*Jones II*"). We hold that the CFC erred in dismissing Jones's claims by improperly limiting the scope of claims cognizable under the bad men provision of the 1868 Treaty.[1] The CFC also erred in applying issue preclusion without considering an essential spoliation issue. We vacate and remand.

## I. BACKGROUND

### A. Circumstances Surrounding Murray's Death

On April 1, 2007, Utah State Trooper Dave Swenson ("Swenson") attempted to stop a car for speeding near to, but outside of, the Uncompahgre Ute Reservation in Utah. The car did not stop but turned into the reservation. About twenty-five miles into the reservation, the car stopped and the driver, seventeen-year-old Uriah Kurip ("Kurip"), and the passenger, twenty-one-year-old Todd R. Murray ("Murray"), exited the car. Swenson exited his

———————————

[1] *See infra* p. 7 for text.

patrol car with his gun drawn, and ordered Kurip and Murray to the ground. Murray and Kurip ran in different directions. Swenson caught and arrested Kurip without further incident.

At some point during the pursuit, Swenson requested back-up. Vernal City Police Officer Vance Norton ("Norton"), Utah Highway Patrol Trooper Craig Young ("Young"), and Uintah County Deputy Anthoney Byron ("Byron") responded. Norton pursued Murray on foot and ordered Murray to the ground. According to Norton, Murray raised a gun and fired two shots towards Norton, and Norton fired two shots at Murray. All of the shots missed. Norton testified that Murray then turned his own gun on himself and pulled the trigger. Norton called dispatch, indicated that shots had been fired, and explained that Murray had shot himself. Meanwhile, Byron and Young approached the scene with their guns drawn. Neither witnessed the shot that brought down Murray. Byron and Young handcuffed Murray.

The officers found an illegally-purchased .380 caliber gun and two bullet casings near Murray. Investigators found two other bullet casings some distance away. A third casing was also found inside the chamber of Norton's gun. An ambulance arrived on the scene thirty-two minutes after the shooting, while Murray was still alive. No officer administered medical assistance to Murray in that time. By the time the ambulance arrived, additional police officers had arrived from various police departments and had "commandeered the site and were asserting state jurisdiction over the site." Complaint at 9, *Jones II*, 122 Fed. Cl. 490 (Fed. Cl. 2013) (No. 1:13-cv-00227).

Federal Bureau of Investigation ("FBI") special Agents Rex Ashdown and David Ryan and Bureau of Indian Affairs ("BIA") Officers James Beck and Terrance Cuch (collectively, "federal officers") then arrived and "ostensibly assumed [federal] jurisdiction of the scene." *Id.* Ashdown took charge of the investigation. The com-

plaint alleges that the federal and local officers prevented Raymond Wissiup—a member of the Ute tribe, a law enforcement officer, and the Director of the Tribe's Fish and Wildlife Department—from accessing the crime scene.

An ambulance took Murray off the reservation to the Ashley Regional Medical Center ("Medical Center") in Vernal, Utah, where was declared dead at 1:19 pm. At the Medical Center, one of the officers allegedly disrobed Murray, photographed him nude, and manipulated his remains. For example, Byron was photographed with his finger in Murray's head wound. A sample of Murray's blood was also taken. Jones alleges that BIA Officer Kevin Myore "condoned and participated in, or failed to prevent" these actions. Complaint at 11, *Jones II*, 122 Fed. Cl. 490 (Fed. Cl. Dec. 3, 2013) (No. 1:13-cv-00227).

The local officers then took Murray's body to the off-reservation Thomson-Blackburn Mortuary ("Mortuary") in Vernal, Utah to await an autopsy. There, Vernal City Police Chief Gary Jensen inserted a needle with syringe into Murray's heart and directed a mortuary employee to make an incision into Murray's jugular vein to collect two vials of blood. No one ever accounted for the blood or provided any reason for the necessity of collecting additional blood, the use of a jugular incision, or the insertion of a needle into Murray's heart.

Murray's body was then transferred to the off-reservation Office of the Medical Examiner ("OME"), where the medical examiner declined to perform an autopsy. Jones alleges that this was done either at the direction of the FBI, or with the FBI's tacit approval.

After an external examination, the medical examiner concluded that the bullet entered the back of Murray's head, above and behind his left ear, and exited on the right side of his head. Murray was right-handed. The medical examiner did not find soot on Murray's hands,

but noted that his right hand was bloodied while his left was clean. The medical examiner considered Murray's death a suicide, but later testified that he could not rule out the possibility that Murray was shot in the back of the head, execution-style.

The federal officers secured the .380 gun, which became the subject of a federal investigation into its illegal sale. In the course of the investigation, Ashdown retired and was replaced by Special Agent Ryan. *Jones v. Norton*, No. 2:09-cv-730-TC, 2014 WL 909569 at *4 (D. Utah Mar. 7, 2014) (unpublished) ("*Spoliation Order*"). When the criminal investigation into the illegal sale of the gun concluded, the judge hearing the case signed an order forfeiting the gun to the government. *Id.* The FBI thereafter destroyed the firearm. *Id.*

Jones alleges that Murray was shot execution-style in the back of the head and that the gaps in the investigation were part of a conspiracy to cover-up this fact. Jones argues that the United States is liable for the actions of the federal and local officers under two treaties negotiated between the United States and the Ute Indians.

## B. The Ute Treaties

The predecessor to the modern Ute Tribe entered into two treaties with the United States, one in 1863 and one in 1868. *See* Treaty with the Utah Tabeguache Band, Oct. 7, 1863, 13 Stat. 673 (hereinafter "1863 Treaty"); Treaty with the Ute, Mar. 2, 1868, 15 Stat. 619 (hereinafter "1868 Treaty").

The Ute Tribe and the United States had a particularly acrimonious relationship prior to the 1863 Treaty, with several rounds of stalled treaty implementations and several skirmishes occurring between the parties. Ned Blackhawk, *Violence Over the Land* 215–16 (2008) (hereinafter, "Blackhawk"). A Ute War Council decided to forgo war in 1863 after being persuaded by Ouray, a leader of the Tabeguache Ute Tribe, that armed resistance to the

United States would be futile.  *Id.*  Ouray led the Ute negotiations, which resulted in the Ute Tribe ceding to the United States "among the largest and most valuable tracts of land ever ceded to the United States," according to Commissioner of Indian Affairs Dole.  *Id.* at 216.  The Tabeguache Band admitted that they reside within the United States, acknowledged the United States' supremacy, and claimed their protection, 1863 Treaty, art. 1; the United States agreed to send monthly payments in goods and provisions, *id.*, art. 2; and the Treaty set the stage for the creation of a large Ute reservation in Colorado's mountain valleys in the 1868 Treaty.  Blackhawk at 216.

The 1868 Treaty established the Ute reservation.  In common with the 1863 Treaty, its goal was peace between the Ute Tribe and white settlers.  *See Tsosie v. United States*, 825 F.2d 393, 395 (Fed. Cir. 1987) (noting nine treaties made in 1868 containing bad men provisions with "peace as their object").

The 1868 Treaty included the following particularly relevant provisions.  Article 2 reads:

> [T]he United States now solemnly agree that no persons, except those herein authorized so to do, and except such officers, agents, and employees of the Government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law shall ever be permitted to pass over, settle upon, or reside in the Territory described in this article, except as herein otherwise provided.

1868 Treaty, art. 2.  Article 6, the primary provision at issue in this case, reads as follows:

> If bad men among the whites or among other people, subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the

> Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

*Id.* at art. 6. We refer to this provision as the "bad men provision" throughout this opinion.

The 1868 Treaty also includes a requirement for a plaintiff seeking damages under the bad men provision to exhaust administrative remedies before filing a claim. *See* 1868 Treaty, Art. 5; *Jones II*, 122 Fed. Cl. at 510. This provision is not at issue on appeal.

## C.  Procedural History

Jones[2] first brought suit in state court in Utah, alleging Constitutional violations committed by the local officers against Murray and the Ute Tribe. The case was removed to the United States District Court for the District of Utah. *Jones v. Norton*, 3 F. Supp. 3d 1170 (D. Utah 2014) ("*Jones I*").

Jones alleged that the state, county, and city officers in various combinations were responsible for various Constitutional violations under 42 U.S.C. § 1983—illegal seizure, excessive use of force, failure to intervene and call for medical attention, assault/battery, and wrongful death—conspiracy to violate civil rights under 42 U.S.C. § 1985, and additional state law tort claims. *Id.* at 1177. On summary judgment, the district court held against Jones, concluding that he failed to establish that the state officers violated the Constitution. It concluded that there was no seizure, that the pursuit was reasonable, and that Murray had, in fact, fired at Norton. *Id.* at 1189. The

---

[2] The reference to "Jones" in this section includes all the Plaintiffs here except the Ute Tribe, which was not a party to the earlier action.

court also concluded that "Plaintiffs offer no more than speculation and no reasonable jury could find that Norton shot Murray in the head at point-blank range." *Id.* at 1191. The court relied primarily on the testimony of Young and Byron that Norton was not near Murray when Murray went down, Norton's testimony that Murray shot himself in the head after exchanging shots with Norton, and the testimony of the medical examiner that the bullet came from point-blank range. *Id.* at 1189—92.

In the course of the litigation, Jones alleged that the local officers spoliated evidence by (1) failing to give aid to Murray after the shooting (thus failing to preserve Murray's life); (2) failing to test Murray's gun for residue and destroying the gun pursuant to a court order; (3) failing to test Norton's gun; (4) failing to preserve the crime scene evidence (e.g., swabbing Murray and Norton's fingers, examining their clothing, searching for bullets, performing blood splatter analysis, or searching Norton); (5) desecrating Murray's body at the Medical Center and Mortuary; and (6) failing to perform a full autopsy. *Spoliation Order*, 2014 WL 909569 at *3–10. The district court concluded that there was no spoliation of evidence by any of the parties to the suit. *Id.* at *1. In particular, the court found that there was no evidence that Murray's wound was survivable and that the failure to give aid was a cause of Murray's death. *Id.* at *3. The court also found that the destruction of Murray's gun was performed on the orders of a judge in a separate investigation, and the state, county, and local officers (collectively, "local officers") did not know about the FBI's imminent destruction of the gun. *Id.* at *4–7. Because the state, county, and local officers did not know about the imminent destruction of the gun, they did not have a duty to request a test of the gun from the FBI. *Id.* The court found that the state, county, and local officials also had no obligation to inquire about the testing of the gun or preserve the crime scene evidence because they were not in charge of the investigation. *Id.* at *7–9. Finally, the court found there was no

prejudice to the plaintiffs for the potential desecration of the body at the Medical Center and Mortuary. *Id.* at *9–10.

The district court's spoliation decision was predicated on the local officers' lack of supervisory authority over several key pieces of evidence, which the court determined were either in the charge of the federal officers, including Ashdown, or the medical examiner. *See id.* at *3 ("Because the shooting took place on the Uintah and Ouray Indian Reservation (the Reservation), the FBI had jurisdiction over the investigation."); *id.* at *7 ("As part of his investigation, Agent Ashdown possibly should have taken Detective Norton's firearm to have necessary tests performed. But Agent Ashdown is not a named Defendant."); *id.* at *8 ("[N]one of the named Defendants can be held liable for these alleged misdeeds, because Agent Ashdown and Keith Campbell were in charge of the investigation."). "No one from the federal government ha[d] been named as a Defendant," and no member of the federal government was a party to the district court litigation. *Id.* at *3 n.3.

The Tenth Circuit affirmed the district court's conclusions with respect to both spoliation and the substantive Constitutional violations. *Jones v. Norton*, 809 F.3d 564, 573-582 (10th Cir. 2015).

### D. Court of Federal Claims

After filing in the district court, but before the Tenth Circuit's affirmance, Jones filed suit in the Court of Federal Claims against the United States, alleging violations of the bad men provision of the 1868 Treaty and a violation of the United States' trust obligations, arising out of the same circumstances surrounding Murray's shooting death. Jones predicated jurisdiction on the Indian Tucker Act and the 1868 Treaty.

The CFC first considered which of Jones's claims were cognizable under the bad men provision. The court relied on two of its previous decisions, *Garreaux v. United*

*States*, 77 Fed. Cl. 726 (2007), and *Hernandez v. United States*, 93 Fed. Cl. 193 (2010), to conclude that "any wrong" in the bad men provision was limited to affirmative criminal acts committed on reservation lands. *Jones II*, 122 Fed. Cl. at 522. Applying these limitations, the CFC dismissed several of Jones's allegations as not cognizable under the bad men provision. *Id.* at 522. These allegations included the failure to take custody of Murray's body and secure the body against desecration and spoliation of evidence, the failure to ensure a proper autopsy was performed, the failure to conduct an investigation into Murray's death, and the failure to protect the territorial integrity of the Tribe's reservation boundary and sovereign interest in maintaining the crime scene. *Id.*

The CFC split Jones's remaining claims—allegations that the federal agents acted in concert with state, county, and local officers to concoct a false story that Murray shot himself, and allegations that some of those officials participated in, allowed, or failed to prevent the desecration of Murray's body and spoliation of critical evidence—into those that occurred off-reservation and those that occurred on the reservation. The court held that acts occurring outside the reservation were not cognizable under the bad men provision, *id.* at 522, and that those on the reservation, although cognizable, were barred by issue preclusion. *Id.* at 529.

With regard to issue preclusion, the court explained that the issues presented in this case and those in the district court were identical—"namely the allegations that officials committed a wrong by pursuing Murray at gunpoint without jurisdiction and without probable cause, by shooting Murray execution-style, and then conspiring to cover-up the execution-style shooting and to obstruct justice." *Id.* at 527 (internal citation omitted). The CFC also held that Jones had a full and fair opportunity to litigate in the district court, explaining that the parties

thoroughly litigated both the substantive determination of whether Norton killed Murray and the underlying spoliation issues. *Id.* at 529. In a footnote, the CFC explained:

> Although the District Court decision addressed only the state and local officers named in the suit, in the District Court's spoliation order, the District Court noted that "[t]he State Defendants and Uintah County Defendants had no responsibility to ensure that Detective Norton's firearm was tested . . . . As part of his investigation, Agent Ashdown possibly should have taken Detective Norton's firearm to have necessary tests performed. But Agent Ashdown is not a named Defendant." [Spoliation Order], 2014 WL 909569, at *7. As determined above, however, only affirmative acts trigger the "bad men" provision of the 1868 Treaty. Plaintiffs offer no claims as to what affirmative action by federal officials took place on Tribal lands which would implicate the "bad men" provision of the 1868 Treaty.

*Jones II*, 122 Fed. Cl. at 529 n.32. The CFC did not consider the effect of the federal officers' actions on either the spoliation issues or the substantive issues.

The CFC also rejected Jones's breach of trust claims, concluding that Jones failed to "identif[y] any 'specific-right-creating or duty-imposing statutory or regulatory prescriptions,' that establish 'specific fiduciary or other duties' that the United States allegedly has failed to fulfill as part of its trust duties." *Id.* at 535 (quoting *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) ("*Navajo Nation I*")). The court therefore dismissed all of Jones's claims. Jones timely appealed. We have jurisdiction over appeals from the Court of Federal Claims under 28 U.S.C. § 1295(a)(3) and the Indian Tucker Act, 28 U.S.C. § 1505.

## II. DISCUSSION

### A. Standard of Review

We review the CFC's dismissal for failure to state a claim de novo. *Frankel v. United States*, 842 F.3d 1246, 1249 (Fed. Cir. 2016). We take all factual allegations in the complaint as true and construe the facts in the light most favorable to the non-moving party. *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012).

We review the CFC's interpretation of treaties de novo, *Richard*, 677 F.3d at 1144–45, and the application of issue preclusion de novo. *Shell Petroleum, Inc. v. United States*, 319 F.3d 1334, 1338 (Fed. Cir. 2003).

### B. Rules of Interpretation of Indian Treaties

In interpreting treaties, we must "attempt to determine what the parties meant by the treaty." *Northwestern Band of Shoshone Indians v. United States*, 324 U.S. 335, 353 (1945). The United States and the Native American Tribes have a "unique trust relationship." *Cty. Of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985). In light of this relationship, we "interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them," *Minn. v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999), and "construe[] [them] liberally in favor of the Indians with ambiguous provisions interpreted for their benefit." *Cty. Of Oneida*, 470 U.S. at 247; *Cty. of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 261 (1992). *See also Richard*, 677 F.3d at 1145, 1149 n.14 (explaining that "[t]he intent of the parties is of particular importance" when interpreting treaties with Indians, and considering the understanding of the Sioux Nation during negotiations to determine their intent).

Determining the way that the Ute Tribe understood the 1868 Treaty presents many complications, owing

primarily to the fundamental differences between the Native societies' oral tradition and the United States society's written tradition. *See Whitefoot v. United States*, 293 F.2d 658, 667 n.15 (Ct. Cl. 1961) ("A great and unbridgeable void existed between the language and culture of the two races."). When determining a non-written culture's understanding of written words, we must be careful to avoid reasoning that holds strictly to our later-established understanding of those words. *See, e.g., Worcester v. Georgia,* 31 U.S. 515, 552–53 (1832), *overruled on other grounds by Nevada v. Hicks*, 533 U.S. 353, 361–62 (2001) (interpreting "allotted" to mean "marked out" and not according to its technical meaning of conveying ownership interest). The Treaty was written in English, however, and we must honor any unambiguous language in the treaty. *Northwestern Band of Shoshone Indians*, 324 U.S. at 353 ("We stop short of varying [the Treaty's] terms to meet alleged injustices."); *Chickasaw Nation v. United States*, 534 U.S. 84, 88–89 (2001) (rejecting application of liberal-construction canon where Court found no ambiguity).

### C.  Claims Cognizable Under the Bad Men Provision

Jones's primary contention is that the actions (and inactions) of the federal officers are the type of wrongs cognizable under the bad men provision and that the CFC erred in limiting the realm of cognizable wrongs to affirmative criminal acts occurring on reservation land. To state a claim for relief under the bad men provision requires the identification of particular "bad men," and an allegation that those men committed a wrong within the meaning of the treaty. *Hernandez*, 93 Fed. Cl. at 200 (citing *Ex parte Kan-gi-shun-ca*, 109 U.S. 556, 567–68 (1883)). Jones identifies the federal officers as "bad men," who have committed several wrongs:

    i.  Acting in concert with state/county/municipal officers, expressly or impliedly, in concocting, or

permitting to be concocted, a false story that Todd Murray shot himself in the back of his head

ii. Failing to take custody of Murray's body and to secure the body against desecration and spoliation of evidence

iii. [skipped in the complaint]

iv. Participating, tacitly allowing, or failing to prevent, the desecration of Murray's body and the spoliation of critical evidence both at the shooting scene and afterwards at the Medical Center, Blackburn Mortuary, and at the Utah Office of the Medical Examiner

v. Failing to insure that a proper autopsy was performed on Murray's body

vi. Failing to conduct any kind of investigation into Todd Murray's murder

vii. Failing to protect the territorial integrity of the Tribe's reservation boundary and the Tribe's sovereign interests in the crime scene where Murray was shot.

*See* Complaint at 18, *Jones II*, 122 Fed. Cl. 490 (Fed. Cl. 2013) (No. 1:13-cv-00227); *Jones II*, 122 Fed. Cl. at 520–21.

In addition to the allegations above, Jones also alleges that Murray suffered "injuries at the hands of bad men," including "the extra-territorial police pursuit, assault upon, and murder of Todd Murray," and "the conspiracy to cover up Todd Murray's murder." Complaint at 17-18, *Jones II*, 122 Fed. Cl. 490 (Fed. Cl. 2013) (No. 1:13-cv-00227). Jones does not identify the particular officers responsible for each of those injuries. Nevertheless, we read paragraphs 67 and 69 liberally in conjunction with paragraph 70, which states, "In addition, or alternatively, the bad men include (i) the Utah state/county/municipal

enforcement officers who were involved in the illegal extraterritorial pursuit and execution-style shooting of Todd Murray, the conspiracy to cover up Murray's execution-style shooting, and the desecration of Murray's body and spoliation of critical evidence." *Id.* at 19. Jones also identifies as bad men "the owners and employees of [the Mortuary] in Vernal, Utah, who permitted and participated in the desecration of Todd Murray's body at the Mortuary." *Id.* For purposes of the appeal from the CFC's motion to dismiss, we consider the alleged actions of all the identified bad men, including the local officers, the mortuary employees, and the federal officers. *See Richard*, 677 F.3d at 1153 (holding that bad men need not be agents of the federal government).

The interpretation of the cognizable claims under the bad men provision of the Ute Treaty requires consideration of three issues: (1) the nature of the cognizable wrongs, (2) the universe of applicable "laws of the United States," and (3) the geographic location of the wrongs. We address each in turn below.

### i. The Bad Men Provision is Limited to Criminal Wrongs

This court has not defined the types of alleged wrongs cognizable under the bad men provisions of this and similar treaties. To perform this analysis, we begin with the text of the 1868 Treaty and consider the "larger context that frames the Treaty," its "history, purpose, and negotiations." *Mille Lacs*, 526 U.S. at 196, 202; *see Richard*, 677 F.3d at 1145. The bad men provision in the 1868 Treaty reads:

> If bad men among the whites or among other people, subject to the authority of the United States, shall commit *any wrong* upon the person or property of the Indians, the United States will . . . proceed at once to cause the offender to be arrested and punished according to the laws of the United

> States, and also reimburse the injured person for the loss sustained.

1868 Treaty, 15 Stat. 619 (emphasis added). The 1868 Treaty does not define "any wrong." The CFC previously limited the cognizable wrongs under similar bad men provisions to affirmative criminal acts. *See* generally *Garreaux*, 77 Fed. Cl. 726; *Hernandez*, 93 Fed. Cl. 193.

In *Garreaux*, a Native-American plaintiff alleged that the United States was liable under a different treaty's bad men provision because agents of the Bureau of Indian Affairs and the Department of Housing and Urban Development failed to administer her land lease properly, causing her to lose her home. 77 Fed. Cl. at 734. The CFC explained that these wrongs were not cognizable under the bad men provision because prior cases brought under that provision were uniformly "criminal in nature," *id.* at 737, and the primary intent of the bad men provision "was to guard against affirmative criminal acts, primarily murder, assault, and theft of property," *id.* at 736 (citing *Kan-gi-shun-ca*, 109 U.S. at 567–68).

The plaintiff in *Hernandez* was indicted for drug-related offenses and brought suit in the CFC under a different treaty's bad men provision, alleging that a narcotics officer bribed a witness to acquire perjured testimony, a judge committed judicial misconduct, the county prosecutor committed prosecutorial misconduct, and the court-appointed counsel provided ineffective assistance. 93 Fed. Cl. at 196. The CFC explained that the "primary intent of [the bad men provision] was to keep the peace between Native Americans and non-Native Americans, and, as such, the Fort Laramie Treaty has been applied to affirmative criminal acts and not mere acts of negligence." *Id.* at 199 (citing *Kan-gi-shun-ca*, 109 U.S. 556 and *Janis v. United States*, 32 Ct. Cl. 407, 409 (1897)). Even as to alleged affirmative criminal acts, the CFC concluded that, although Plaintiff "makes many claims that might result in criminal punishment," none of

those alleged acts "would have threatened the peace that the Fort Laramie Treaty was intended to protect." *Id.* The court reasoned that none of the alleged acts could be "considered a crime of moral turpitude that the 'Bad Men' clause purports to cover." *Id.* at 199 n.5 (citing *Kan-gi-shun-ca*, 109 U.S. at 567; *Elk v. United States*, 70 Fed. Cl. 405, 405–06 (2006)).

The CFC here applied *Hernandez* and *Garreaux* to dismiss most of the alleged wrongs for failure to meet the "affirmative criminal acts test" because "inaction is not a recognized harm under the 1868 Treaty." *Jones II*, 122 Fed. Cl. at 522. Specifically, the Court explained that, "[b]ecause arresting and criminally prosecuting individuals for civil wrongs does not logically follow, 'wrongs,' as defined by the 1868 Treaty, are only allegations of criminal wrongs." *Id.*

Jones argues that both the text and context of the treaty compel a reading of the bad men provision that would encompass the officers' actions here. Jones argues that the Native Americans in 1868 would not have understood "any wrong" as limited to affirmative criminal acts because: (1) on its face, the bad men provision recognizes the commission of "any wrong," without a limitation such as "any [criminal] wrong"; (2) in 1868, the ordinary meaning of "wrong" was not limited to acts that violate criminal laws, but meant "deviates from moral rectitude; any injury done to another; a trespass; a violation of right," Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828); (3) the United States' duty to "arrest[] and punish[]" wrongdoers is separate from—and does not limit the scope of—cognizable wrongs; (4) the distinction between civil and criminal wrongs is an Anglo-American import, and the Ute leaders would not have understood a distinction between wrongs worthy of redress through criminal law, and those admitting solely to civil penalties; and (5) the context of the 1868 Treaty manifests an intent to protect Native Americans' right to be free from a broad

array of injuries caused by non-Indians, because tribal members were not afforded the same rights as U.S. citizens, and that policy would not be served by an affirmative acts limitation to cognizable wrongs.

In addition, Jones argues that the CFC wrongly decided *Hernandez* and *Garreaux* based on an overbroad reading of the Supreme Court's decision in *Kan-gi-shun-ca*, and the United States' commitment to "arrest" wrongdoers should be read as "stopping the motion of" wrongdoers, and not as criminal arrest. Any other reading, according to Jones, "judicially nullifies the justifiable expectations of the Ute Tribe and its tribal members." Appellant Reply Br. 24.

The Government first argues that the Treaty unambiguously obligates the United States to "arrest[] and punish[]" those who commit the "wrong," which necessarily limits the scope of cognizable wrongs to those for which arrest is an appropriate punishment. The Government notes that every case of a cognizable wrong has involved an affirmative and aggressive criminal act. Second, the Government argues that the bad men provision says "*commit* any wrong," and a bad man can only "commit" affirmative acts—as distinguished from omitting to act. The Government argues that we have so held in *Hebah II*, where we defined a wrong as an "[a]ction or conduct which inflicts harm." 456 F.2d at 704. To support both of these limitations, the Government argues that the bad men provision was intended to prevent crime or aggression by whites against the Native Americans, Indian Peace Commission, H. Exec. Doc. No. 40-90 (1868); Conditions of the Indian Tribes: Report of the Joint Special Committee Appointed Under Joint Resolution of March 3, 1865, S. Rep. No. 39-156 at 5 (1867) ("The committee are [sic] of [the] opinion that in a large majority of cases Indian wars are to be traced to the aggressions of lawless white men."), a purpose which would not be served by

including omissions or non-criminal action into the cognizance of the bad men provision.

We agree with the Government that only acts that could be prosecutable as criminal wrongdoing are cognizable under the bad men provision. We turn first to the text of the 1868 Treaty itself. *Mille Lacs*, 526 U.S. at 206. The text unambiguously commits the United States to arrest and punish those who commit a wrong. This commitment to arrest is express, 1868 Treaty, 15 Stat. 619 ("[T]he United States will . . . proceed at once to cause the offender to be arrested"), and is *in addition to* the commitment to "punish[]" the wrong-doer and to reimburse the injured person, *id.* ("[T]he United States will . . . cause the offender to be arrested *and* punished according to the laws of the United States, *and also* reimburse the injured person for the loss sustained.") (emphases added). The definition of "any wrong" is thus tied to the concept that the United States would at least have the authority to make an arrest with respect to such wrongs.

There are only two internally consistent ways of interpreting the bad men provision. Either (1) "any wrong" is limited to criminal wrongdoing, or (2) the United States agreed to arrest non-criminal wrongdoers where the victim was a Native. Jones argues that the second interpretation is correct because, "[t]o construe it otherwise would require Natives to endure harm to their person or property from, for example, the reckless behavior of non-Indians not rising to the level of a federal crime such as, for example, constitutional torts." Appellant Br. 22. We disagree.

"An arrest is the initial stage of a criminal prosecution." *Terry v. Ohio*, 392 U.S. 1, 26 (1968). In most circumstances, "[w]hether [an] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge . . . were sufficient to warrant a

prudent man in believing that the petitioner had commit- ted or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964). Even the limited circumstances that fall outside this rule require some connection with criminal wrongdoing. *See generally* 1 Charles Alan Wright et al., Federal Practice and Procedure § 58 (4th ed. 2016) (explaining circumstances of allowable warrantless arrest).

Jones has not argued that proof of a non-criminal wrong justifies an arrest. Absent explicit language to the contrary, we cannot reasonably read the bad men provi- sion to obligate the United States to disregard the struc- ture of our jurisprudential system so blatantly by compelling arrest for non-criminal acts. If the bad men provision is *not* limited to criminal wrongs, moreover, its scope would be largely indefinite, placing on the United States government the duty to arrest individuals and reimburse injured parties for anything that might be considered a "wrong." The breadth of such a provision could extend to simple negligence or breach of contract claims without a principled distinction between cogniza- ble and non-cognizable claims.

Jones argues that the commitment to "arrest" does not require criminal arrest, but should be read in the sense of "to obstruct; to stop; to check or hinder motion." Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828). In this context, Jones's definition would mean that the United States agreed to remove non- Indian wrong-doers from the reservation. This argument is unconvincing. First, Jones offers no evidence that this was the understanding of the Ute Tribe. Second, it is unclear what mechanism the United States could use to "stop the motion" of wrongdoers on the Reservation other than to arrest the wrongdoers.

We reject Jones's argument that limiting the bad men provision to criminal wrongdoing fails to read the 1868 Treaty in the way the Indian leaders would have under-

stood it.  In interpreting a treaty, we "attempt to determine what the parties meant by the treaty[, but  w]e stop short of varying its terms to meet alleged injustices." *Northwestern Band of Shoshone Indians*, 324 U.S. at 353. Even if the Ute leaders may not have appreciated the complex distinction between American civil and criminal law, we may not interpret the 1868 Treaty in a way that the United States would not reasonably have agreed to adopt at the time of the signing.  In other words, the extent of our interpretive deference to the perspective of the Native leaders cannot extend past the meeting of the minds between the parties.  See *Confederated Bands of Ute Indians v. United States*, 330 U.S. 169, 179 (1947) ("While it has long been the rule that a treaty with Indians is to be construed so as to carry out the Government's obligations in accordance with the fair understanding of the Indians, we cannot, under the guise of interpretation . . . rewrite congressional acts so as to make them mean something they obviously were not intended to mean."); *South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 506 (1986) ("The canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress.").  We therefore hold that only wrongs that could give rise to arrest and potential criminal prosecution are cognizable under the 1868 Treaty's bad men provision.[3]

---

[3]    As the CFC correctly explained, it is not a prerequisite to maintaining a claim under the bad men provision that criminal charges actually be brought against the alleged bad men.  *Jones II*, 122 Fed. Cl. at 523 ("The court, however, cannot infer from the absence of prosecutions that all the FBI and BIA actions were taken permissibly.").

ii. The Universe of "Laws of the United States"

The CFC had no cause to address the source of the "laws of the United States" for purposes of the bad men provision, and as such, we do not have the benefit of either a trial court opinion or the parties' briefing. We thus restrict ourselves to a general discussion and remand to the CFC to consider in the first instance the application of these principles to the case at bar.

As of 1817, "any crime, offense, or misdemeanor" committed "within any town, district, or territory belonging to any nation or nations, tribe or tribes, of Indians" was punishable in like manner to how it would be punished on non-Native land under the sole and exclusive jurisdiction of the United States. Indian Country Crimes Act, 3 Stat. 383 (1817). At the time of the 1868 Treaty, there was a body of federal criminal law understood to apply to Indian country beyond that limited number of laws explicitly addressing actions on the reservation.

That law has since evolved into 18 U.S.C. § 1152 (2006) (emphasis added): "Except as otherwise expressly provided by law, *the general laws of the United States* as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country." Indian Reservations are "Indian country" for purposes of § 1152. 18 U.S.C. § 1151 (2006).

The "general laws of the United States" in § 1152, as it existed in 2007, included what is now the Assimilative Crimes Act, 18 U.S.C. § 13 (2006),[4] *Williams v. United*

---

[4]    This Act also has a long history. Beginning in 1824, it was applied primarily to naval and military bases, *see United States v. Press Pub. Co.*, 219 U.S. 1, 10 (1911); 30 Stat. 717 (1898); 4 Stat. 115 (1824), and it later extended to Indian Country.

*States*, 327 U.S. 711, 713 & n.3 (1946), which makes federally punishable any act or omission committed on "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof," where that act or omission would be punishable under state law if committed within the state's jurisdiction.[5]  18 U.S.C. § 7 (2006).

We leave it to the CFC in the first instance to determine whether any of the "wrongs" Jones alleges would subject the alleged bad men to arrest under the "laws of the United States," and as such, are cognizable under the bad men provision.

### iii.  Whether The Bad Men Provision Is Limited to Affirmative Acts Should Be Explored on Remand If Necessary

The CFC also limited the cognizable claims under the bad men provision to those that alleged affirmative acts, rejecting claims premised on alleged omissions.  We do not decide whether the bad men provision is limited to affirmative acts.  At present, Jones has not yet explained what particular crimes each alleged omission constituted, so we do not have concrete criminal-law duties to analyze.  We also have not been provided with sufficient briefing to decide the question in the abstract.  If, on remand, Jones establishes that any of the alleged omissions constitute crimes (under the laws of the United States, as discussed above), the CFC should reconsider the affirmative-acts issue in the context of a specific crime or crimes, with more complete briefing by the parties.

We limit our discussion here to only certain aspects of the issue.  We begin with the language of the bad men

---

[5]  Subject to the limitation that Congress has not made that same act or omission independently punishable.  18 U.S.C. § 13 (2006).

provision.    The provision applies to bad men who
(a) "commit any wrong" (b) "upon the person or property
of the Indians."

The first phrase, notably, is not "commit any act" or
even "commit any wrongful act."   Rather, it is "commit
any wrong."   That phrase is closely akin to "commit any
crime," or "commit any offense," phrases that in familiar
legal usage appear to cover committing a crime by a
failure to act in the (comparatively few) circumstances in
which there is a criminal-law duty to act.  *See* 1 Wayne R.
LaFave, Subst. Crim. L. § 6.2 (2d ed. 2016) ("Most crimes
are committed by affirmative action rather than by non-
action.  But there are a number of statutory crimes which
are specifically defined in terms of failure to act, and
other crimes which, though not specifically so defined,
may be committed either by affirmative action or by
failure to act under circumstances giving rise to a legal
duty to act."); Model Penal Code § 2.01(3) (2015) ("Liabil-
ity for the commission of offense may not be based on an
omission unaccompanied by action unless: (a) the omis-
sion is expressly made sufficient by the law defining the
offense; or (b) a duty to perform the omitted act is other-
wise imposed by law.").  Even as to that phrase, however,
we have not been presented a full historical analysis of
the common usage of it at the time.

The Treaty provision also does not stop at the first
phrase.   The second phrase requires that the wrong be
committed "upon the person or property of the Indians."
That phrase might suggest a focus on affirmative acts.
Again, however, we do not know enough to so hold.  We
lack briefing on a proper historical understanding of that
phrase, in general or in the relevant context.   That con-
text plainly includes a focus on keeping the peace and
preventing retaliation for wrongs.  *Richard*, 677 F.3d at
1154–55 (Lourie, J., dissenting); *Tsosie*, 825 F.2d at 395;
*Hernandez*, 93 Fed. Cl. at 199.  It is possible the particu-
lar criminal failures to act would be so generally under-

stood to be injurious that they would provoke the retaliation the Treaty meant to prevent. We cannot at present say.

In short, we currently lack the context or historical analysis required to determine whether the language of the bad men provision covers criminal omissions—or perhaps only some criminal omissions—as well as commissions. Indeed, we do not currently have enough information to decide definitively even whether the provision ultimately involves an ambiguity to be resolved in favor of the Indians under established canons of construction. *See Seufert Bros. Co. v. United States*, 249 U.S. 194, 198 (1919) ("We will construe a treaty with the Indians . . . as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection, and counterpoise the inequality by the superior justice which looks only to the substance of the right without regard to technical rules.") (quoting *United States v. Winan*, 198 U.S. 371, 380 (1905)); *Worcester v. Georgia*, 31 U.S. 515, 547, 552–53 (1832), *distinguished on other grounds by Nevada v. Hicks*, 533 U.S. 353, 361–62 (2001) (interpreting the Hopewell Treaty with the Cherokee Indians, which included a provision whereby the United States "allotted" land for Native hunting grounds. There, "allotted" meant simply "marked out," and was not used as a technical indicator of ownership, because the focus of the Hopewell Treaty was the *location* of the line being drawn, and the Cherokee would not have recognized the legal import of the word "allotted" beyond that of "marked out").

Governing case law, contrary to the Government's assertion, does not resolve the issue. To date, all of the cases that are precedent in this court involved affirmative acts; none presented the question whether some omissions could come within the bad men provision. Accordingly, we have never held that a wrong under the bad men provision must be an affirmative act.

In *Hebah II*, we defined a wrong broadly as an "[a]ction or conduct which inflicts harm." 456 F.2d at 704. But as in every other pertinent case that this court, its predecessor, or the Supreme Court has heard, the alleged wrong—a killing—was indisputably cognizable under the bad men provision as both a criminal wrong and an affirmative act. Nothing in the *Hebah II* definition dictates the affirmative-acts limitation the Government proffers.

The CFC in this case relied on its earlier decisions in *Garreaux* and *Hernandez* to support its affirmative-acts limitation, but those cases are not binding precedent for us, and they relied on overbroad readings of the Supreme Court's decision in *Kan-gi-shun-ca* and the Court of Claims' decisions in *Janis, Elk*, and *Hebah v. United States*, 428 F.2d 1334, 1338 (Ct. Cl. 1970) ("*Hebah I*"). The nature of wrongs cognizable under the bad men provision was never at issue in *Kan-gi-shun-ca*, an action brought by the family of a murder victim against an alleged bad man from the same tribe, 109 U.S. at 567, or in *Janis*, an action brought by a non-Native citizen who had been adopted into a tribe against members of that tribe for cattle theft, 32 Ct. Cl. at 408. The alleged acts in both were unquestionably "wrongs." *Elk*, which dealt with the scope of administrative exhaustion, is likewise inapposite. *See* 70 Fed. Cl. at 405. *Hebah I* addressed whether a claim under a bad men provision could be brought by an individual (the widow of a Native American) or must be brought on behalf of the tribe itself. 428 F.2d at 1337. These cases do not compel finding an affirmative-acts limitation in the bad men provision.

It is unnecessary and inadvisable to go further at this stage. On remand, Jones may or may not identify applicable crimes covering the alleged omissions. If Jones does so, the legal analysis can be both more focused (on those crimes) and more developed than it currently is. We therefore vacate the CFC's ruling that the alleged omis-

sions are not cognizable under the bad men provision, and we include those omissions, to be addressed anew if necessary, in the remand.

iv. Territoriality of the Bad Men Provision

Without citing any authority, the CFC added the further limitation that any actions or omissions performed off the reservation are necessarily outside the scope of the bad men provision. *Jones II*, 122 Fed. Cl. at 522 ("The court also notes, however, that defendant is correct that the 'bad men' provision does not include, as plaintiffs[] suggest[,] the universe of off-reservation activities that would have occurred but for the initial conduct on the reservation."). The court thus dismissed all the claims of "wrongs" occurring at the Medical Center, the Mortuary, and at the OME as not cognizable under the bad men provision. For the reasons explained below, we find that the CFC erred in dismissing all the off-reservation actions as not cognizable.

The text of the bad men provision itself does not limit cognizable wrongs to those occurring wholly on reservation lands. Indeed, the bad men language broadly protects against wrongs "upon the person or property of the Indians." 1868 Treaty, 15 Stat. 619. Nothing in the remainder of the 1868 Treaty explicitly limits the geographic scope of where cognizable wrongs may be committed. *Compare id. with* Treaty With the Navajo, June 1, 1868, 15 Stat. 667 ("[I]f any Navajo Indian or Indians shall leave the reservation herein described to settle elsewhere, he or they shall forfeit all the rights, privileges, and annuities conferred by the terms of this treaty.") (discussed in *Herrera v. United States*, 39 Fed. Cl. 419, 420 (1997), *aff'd*, 168 F.3d 1319 (Fed. Cir. 1998)).

This court and its predecessor have commented on the territorial scope of similar bad men provisions. *See Richard*, 677 F.3d at 1153 n.22 ("[C]laims under this provision are limited to the clear geographic limits found in the

Treaties."); *Campbell v. United States*, 44 Ct. Cl. 488, 491–92 (1909) (applying a provision similar to the bad men provision, and explaining that the treaty "contemplates such injuries as result from invasion or aggression on the territory or reservation of the [Indians]"); *Janis*, 32 Ct. Cl. at 410 (discussing the general purpose of the bad men provision as "contemplat[ing] that the Indians shall be responsible for what Indians do within the white man's territory and that the Government will be responsible for what white men do within the Indian's territory."); *Pablo v. United States*, 98 Fed. Cl. 376, 382 (2011) (no compensation awarded under a bad men provision for wrongs suffered outside the boundaries of the reservation recognized by a Treaty). None of these decisions, however, created a strict territorial line at the reservation boundary for cognizable wrongs under the bad men provision. In *Richard*, for example, the only issue was whether government liability under the bad men provision was limited to actions performed by government actors, or whether it could extend to a drunk driver who killed two Sioux men on land indisputably within the Sioux reservation. 677 F.3d at 1142, 1153. The footnote in *Richard* that the provision at issue was "limited to the clear geographic limits found in the Treaties," *id.* at 1153 n.22, does not define where a wrong actually occurred or the implications for wrongs physically committed off the reservation following on-reservation acts. *Janis* similarly failed to address the geographic location issue and was primarily concerned with whether a white man who had been adopted into the Sioux nation could bring a claim under a bad men provision for injuries done to him by an Indian. 32 Ct. Cl. at 408–411.

*Pablo* does not help the Government either—that action was brought by a Plaintiff who had no permanent address on the reservation and was not a registered member of the Tribe that was party to the treaty includ-

ing the bad men provision. 98 Fed. Cl. at 382.[6] The Fort Sumner Treaty that gave rise to the bad men provision at issue in *Pablo* included a provision that is arguably geographically-limiting, unlike the 1868 Treaty at issue here. *See id.* at 378 ("[I]t is further agreed and understood by the parties to this treaty, that if any Navajo Indian or Indians shall leave the reservation herein described to settle elsewhere, he or they shall forfeit all the rights, privileges, and annuities conferred by the terms of this treaty"). Finally, *Campbel*l, 44 Ct. Cl. 488, does not support a strict geographic limitation because there was no bad men provision at issue and our predecessor court held that cognizable injuries were those that "*result from* invasion or aggression on the territory or reservation," not simply ones that physically and wholly occurred on the reservation. *Id.* at 491 (emphasis added).

Jones does not argue that the bad men provision is unlimited in geographic scope, but argues that a wrong committed on reservation land and continuing off-reservation land is cognizable. We agree with this general principle. Even assuming, without deciding, that the bad men provision includes some form of geographic boundary, the bad men provision may take cognizance of off-reservations activities that are a clear continuation of activities that took place on-reservation. For a general discussion of the treatment of territoriality issues in criminal law, which we do not suggest applies in any given particular here, see 4 Wayne R. LaFave et al., Crim. Proc. § 16.4(b), (c) (4th ed. 2016).

---

[6] The attack in *Pablo* occurred on, and the victim was a resident of, a reservation of another Tribe that was not within the scope of the treaty at issue. 38 Fed. Cl. at 381. The tribe on whose land the attack occurred was a party to a different treaty that also included a bad men provision, but this was held not to change the geographic limitation of the actual treaty at issue. *Id.* at 382.

Like the alleged affirmative acts limitation, a geographic limitation would ill-serve the peace-creating and peace-maintaining policy of the 1868 Treaty. Wrongs occurring off-reservation that occur as a direct result of wrongs occurring on-reservation may be as injurious to peace as those same acts occurring wholly on reservation. For example, it would make little sense to treat a kidnapping and murder wholly on reservation land as a cognizable wrong, but exclude from the bad men provision off-reservation damages resulting from a kidnapping on the reservation. This is not to say that all off-reservation wrongs fall within the cognizance of the bad men provision, only that the geographic line is not as bright as that drawn by the CFC.

Here, Jones alleges that bad men committed wrongs after Murray was taken from the site of the shooting on the reservation to the off-reservation Medical Center, the Mortuary, and the OME, and that at least some of these wrongs were a continuation of the conspiracy to cover-up Murray's on-reservation killing. Jones also alleges that the off-reservation destruction of the gun and the off-reservation failure to preserve evidence and investigate were wrongs directly tied to the circumstances of his death.

The inquiry into which off-reservation acts are a clear continuation of on-reservation activities is heavily fact-dependent. The CFC erred in summarily dismissing Jones's allegations of off-reservation wrongs without considering the connection those alleged wrongs had, if any, to the alleged on-reservation wrongs. We leave it to the sound judgment of the CFC to determine, in the first instance, whether any of these off-reservation acts demonstrate the alleged continuation of on-reservation acts so as to be cognizable under the bad men provision.

### D.  Issue Preclusion

Issue preclusion is available as a defense when the following four elements are met:

> 1.  The issue previously decided is identical with the one presented in the action in question.
>
> 2.  The prior action has been finally adjudicated on the merits.
>
> 3.  The party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication.
>
> 4.  The party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*See Park Lake Res. Ltd. Co. v. United States Dep't of Ag.*, 378 F.3d 1132, 1136 (10th Cir. 2004).[7]  The party asserting issue preclusion bears the burden to establish each of these elements.  *Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1297 (10th Cir. 2014).

The CFC held that the district court's factual findings—i.e., that Murray had indeed killed himself and that there was no conspiracy to cover-up the culpability of the local officers—and the legal determination of no spoliation, met each of the elements for issue preclusion.  *Jones II*, 122 Fed. Cl. at 525–30.  The CFC thus dismissed all of

---

[7]  The CFC here applied the issue preclusion law as framed by the Tenth Circuit, and neither party contests this choice of law.  The elements of issue preclusion are essentially the same under Federal Circuit and Tenth Circuit law.  *Compare Park Lake*, 378 F.3d at 1135 *with Biafora v. United States*, 773 F.3d 1326, 1333 (Fed. Cir. 2014).  We do not believe the choice of law is dispositive, and we follow the parties and the CFC in applying Tenth Circuit law.

Jones's claims that it deemed potentially cognizable under the bad men provision. *Id.* at 530.

Jones concedes that the Government satisfied elements two and three of issue preclusion, but argues that the issues are not identical, and that she did not receive a full and fair opportunity to litigate these issues in the district court. Jones frames her objections in various ways. First, Jones argues that the issues raised in the CFC—primarily, whether the state and federal officers were bad men—are distinct from the Constitutional tort issues against the state and local officials decided in the district court. Second, Jones argues that she did not have a full and fair opportunity to litigate in the district court because the absence of the federal officers created significant procedural limitations in asserting spoliation. Finally, Jones argues that the district court's spoliation decision did not decide whether the federal officers spoliated evidence, but only that state and local officials could not be charged with that spoliation.

The Government argues that the "core" of the case—which the government defines as the alleged extrajudicial pursuit of Murray, the execution-style killing of Murray, and the conspiracy to cover-up the killing—has already been fully litigated. In particular, the Government cites the district court's conclusion that the evidence "clearly shows that Mr. Murray shot himself" and that "no reasonable jury could find that Detective Norton inflicted the mortal blow to Mr. Murray." *See Jones I*, 3 F. Supp. 3d at 1191–92. The Government argues that the district court also definitively held that there was no spoliation of evidence. In response to Jones's argument with respect to the failure of the district court to rule on the federal officers' failure to investigate the scene or Norton's gun, or their destruction of the gun, the Government argues that those claims are not cognizable under the bad men provision.

We agree with Jones that the CFC erred in issue precluding Jones's claims against the United States. In the district court, Jones argued that the local officers spoliated evidence by: 1) failing to render aid to Murray after the shooting; 2) failing to secure the evidence on the scene; 3) failing to test or secure Norton's gun for blowback (potentially indicative of it being used to shoot Murray from close-range); 4) failing to test the gun found near Murray (potentially exculpatory evidence that Murray did *not* shoot himself from close range); 5) destroying the gun found near Murray; and 6) failing to perform a full autopsy on Murray. Because the federal officers were not parties to the suit, the district court excluded the actions of the federal officers in determining whether to issue spoliation sanctions. *See Spoliation Order,* 2014 WL 909569, at *7. The district court explained that the *local officers* could *not* be liable for several alleged acts of spoliation *because* the duty to preserve the evidence was not on them, but on the non-party federal officers. *See id.* For example, with respect to Norton's firearm, the district court noted that "Plaintiffs have possibly been prejudiced by the lack of evidence that testing might have uncovered," but held that none of the Defendants (the local officers) were spoliators. *Id.* This was because, in part, the state, county, and local officers "had no responsibility to ensure that Detective Norton's firearm was tested," and although "Agent Ashdown possibly should have taken Detective Norton's firearm to have necessary tests performed," "Agent Ashdown is not a named Defendant." *Id.* The district court did not decide whether Jones was, in fact, prejudiced, or whether Ashdown's failure to test the firearm justified spoliation sanctions.

Similarly, the district court did not decide whether spoliation sanctions would be appropriate for (1) the federal officers' failure to test or preserve the .380 firearm found near Murray, *see id.* at *6, and (2) the federal officers' failure to investigate and preserve the scene of the shooting—such as testing for gunshot residue on

Murray's and Norton's hands, and testing Norton and Murray's clothes for blood or tissue. *Id.* at *8–9 ("None of the named Defendants can be held liable for these alleged misdeeds, because Agent Ashdown and Keith Campbell were in charge of the investigation"; "Agent Ashdown and Officer Campbell were in charge of documenting the physical evidence for the investigation. . . . None of the named Defendants had the responsibility or duty to investigate and document the actual scene of the shooting . . . . [so] the court will not impose sanctions on any of the Defendants.").

The absence of the federal officers as defendants in the district court litigation fundamentally undermines the preclusive effect of several of the district court's ultimate conclusions, including the key conclusion that Murray shot himself. But for the destruction of the cited evidence, Jones may have shown that Murray was, in fact, shot by Norton. Though the lost evidence may not be retrieved—and, even if retrieved, may have corroborated Norton's testimony—a determination of spoliation may trigger a sanction that could provide sufficient evidence for Jones's claims to survive a motion to dismiss or for summary judgment. To allow the application of issue preclusion here would, by implication, decide that issue for the first time without any substantive debate. "[T]he rules of issue preclusion do not purport to prohibit litigation of matters that never have been argued or decided." 18 Charles Alan Wright et al., Federal Practice and Procedure § 4416 (2d ed. 2016). Notably, the question we consider is not whether claims against the local officials are barred by claim preclusion—surely they are—but whether the claims against the United States under the bad men provision are barred by issue preclusion—they are not.

Applying issue preclusion here would undercut the district court's explicit statements that it was *not* deciding the federal officers' liability for spoliation. "Courts in subsequent actions have honored express statements by

the court deciding the first action that a particular issue was not being decided." *Id.* at § 4417.  Though the district court did ultimately decide that Murray shot himself and that there was no conspiracy, the preclusive effect of that conclusion is explicitly limited to situations where no additional evidence (possibly in the form of spoliation sanctions) arises out of the federal officers' actions with respect to the evidence.

The culpability of the federal officers for spoliation has never been decided, and to assume the resolution of such a central issue *ipse dixit* without substantive consideration "depriv[es] litigants of their first chance[] to litigate an issue," *see Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 1371 (Fed. Cir. 2013), and is an improper application of issue preclusion.

We thus vacate the CFC's dismissal on the basis of issue preclusion, and remand for consideration, in the first instance, of Jones's spoliation assertions and the appropriate sanction, if any.  If the CFC concludes on remand that spoliation sanctions are not appropriate, or that the appropriate sanctions would not change the evidentiary landscape for particular issues,[8] the CFC may reconsider the application of issue preclusion.  If it determines that sanctions are appropriate and do change the evidentiary landscape, the CFC should independently consider Jones's substantive allegations of bad men violations.

## E.  Breach of Trust

On appeal, Jones presses a claim that the United States assumed a fiduciary duty to the Ute Tribe mem-

---

[8]    If the CFC determines that the federal officer spoliated evidence, we leave it to the sound discretion of the CFC to decide, in the first instance, which of its findings, if any, were affected by the spoliation and which were not.

bers, and that it violated that duty. "To state a claim cognizable under the Indian Tucker Act . . . a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Navajo Nation I*, 537 U.S. at 506.

On appeal, Jones points only to the bad men provision of the 1868 Treaty as the substantive source of law. Jones therefore must show a breach of the bad men provision as a condition precedent to state a claim for breach of trust. As such, the inquiry into the breach of trust violation collapses into the bad men inquiry.

If the CFC decides on remand that the United States has not violated the bad men provision, then Jones's failure to show a breach of that provision also compels dismissal of the breach of trust claim. If the CFC decides on remand that the United States has violated the bad men provision, Jones will be entitled to compensation directly under the bad men provision, and the trust claim will be cumulative to that provision.

## VACATED AND REMANDED

### COSTS

No costs.