NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**DEBRA JONES, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF TODD R. MURRAY, DECEASED, FOR AND ON BEHALF OF THE HEIRS OF TODD R. MURRAY, ARDEN C. POST, INDIVIDUALLY AND AS THE NATURAL PARENTS OF TODD R. MURRAY,**
*Plaintiffs-Appellants*

**UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,**
*Plaintiff*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2020-2182

---

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00227-RAH, Judge Richard A. Hertling.

---

Decided:  February 16, 2022

---

JEFFREY S. RASMUSSEN, Patterson Earnhart Real Bird & Wilson LLP, Louisville, CO, argued for plaintiffs-

appellants.  Also represented by FRANCES C. BASSETT.

THEKLA HANSEN-YOUNG, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by JEAN E. WILLIAMS.

_____

Before NEWMAN, O'MALLEY, and TARANTO, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

Debra Jones and Arden C. Post (collectively "Mr. Murray's parents") appeal from a final judgment in favor of the United States in *Jones v. United States*, 149 Fed. Cl. 335 (Fed. Cl. 2020) ("*Issue Preclusion Order*") and from an order sanctioning the United States for spoliating a handgun and finding that the federal government did not spoliate other evidence in *Jones v. United States*, 146 Fed. Cl. 726 (Fed. Cl. 2020) ("*Spoliation Order*").  We hold that the Court of Federal Claims ("Claims Court") applied the wrong standard in its spoliation opinion when it found that the government did not have a duty to preserve any allegedly spoliated evidence other than the Hi-Point .380 handgun.[1]  We also conclude that the Claims Court abused its discretion in issuing an ineffective sanction for the government's spoliation of the handgun.  We further find that the Claims Court erred in finding that the spoliation of the handgun did not change the evidentiary landscape of this case as compared to a related previously litigated case before the District Court for the District of Utah.  That erroneous finding led the Claims Court to incorrectly find that the doctrine of issue preclusion barred Mr. Murray's

_____

[1]    The United States does not cross-appeal the Claims Court's finding that the United States spoliated the Hi-Point .380 handgun and we do not disturb that finding.

parents from relitigating issues critical to their claims. We *reverse-in-part*, *vacate-in-part*, and *remand*.

## I.    BACKGROUND

This is the second time this case has come before this court. The background of this case is described in our prior opinion, *Jones v. United States* (*Jones II*), 846 F.3d 1343 (Fed. Cir. 2017). We briefly summarize the pertinent background here.

On April 1, 2007, Todd Murray, a member of the Ute Indian Tribe, was shot to death. The circumstances of his death are in dispute. Mr. Murray's parents contend that he was shot by an off-duty police officer employed by the Vernal City Police Department, Vance Norton. Officer Norton contends that Mr. Murray shot himself. Mr. Murray's parents argue that the United States' spoliation of evidence makes it impossible to determine which party is correct.

Officer Norton was driving his personal vehicle outside of the Uintah and Ouray Reservation[2] ("Reservation") when he saw a Utah State Trooper in pursuit of a vehicle. Officer Norton joined the chase. Some 25 miles within the border of the Reservation, well beyond the jurisdiction of either the Vernal City Police Department or the Utah State Troopers, the car chase ended. The driver of the car and his passenger, Mr. Murray, emerged from their vehicle and fled in different directions. Officer Norton came on the scene shortly thereafter. He pursued Mr. Murray.

At this point, the parties' stories diverge. Officer Norton claims Mr. Murray fired a gun at him, whereupon Officer Norton retreated and fired two rounds at Mr. Murray. He claims both of those shots missed. According to Officer

---

[2]    Our prior decision in this case refers to the Reservation by another name, the Uncompahgre Reservation.

Norton, Mr. Murray turned his gun on himself and shot himself in the head.

Mr. Murray's parents contend that the manner of Mr. Murray's death is unknown because the United States destroyed or failed to collect key evidence. They also assert that the scant evidence that still exists indicates that Officer Norton shot Mr. Murray.

After Mr. Murray was shot, two more officers, Trooper Craig Young and Uintah County Deputy Anthoney Byron, arrived on the scene. They handcuffed Mr. Murray, who was, at that time, still alive. Officer Norton walked the scene, taking photographs. An ambulance arrived and took Mr. Murray to a hospital, where he died.

Federal Bureau of Investigation ("FBI") agents arrived on the scene after the ambulance had departed with Mr. Murray. The FBI had jurisdiction to investigate the incident because it has exclusive jurisdiction to investigate incidents on the Reservation involving non-tribal law enforcement officers. When he arrived on the scene, FBI Special Agent Rex Ashdown was told that Mr. Murray had shot himself. He collected evidence, including the gun on the ground near where Mr. Murray had been shot—a Hi-Point .380. He also collected two spent .380 caliber shell casings found near the Hi-Point .380, collected two spent .40 caliber shell casings from Officer Norton's .40 caliber handgun, and photographed the scene. Agent Ashdown spoke with Officer Norton, whom he had known professionally for a decade, on the scene. He did not perform or request any testing of Officer Norton's clothing or firearm.

Vernal City Police Chief Gary Jensen took possession of Officer Norton's firearm. He did not perform any testing on the firearm or on Officer Norton's clothes. The gun was later returned to Officer Norton.

After Mr. Murray passed away at the hospital, an officer was photographed inserting his fingers in the wound

in Mr. Murray's skull. State and local police officers then transported Mr. Murray's body to a mortuary. At the mortuary, those officers attempted to draw blood from Mr. Murray's body by inserting a needle into his heart. Then a mortuary employee, at the officers' behest, cut Mr. Murray's neck to obtain a blood sample.

The next day, Mr. Murray's body was transported to the Office of the Utah Medical Examiner in Salt Lake City. The FBI asked the Medical Examiner to perform an autopsy. The Medical Examiner performed an external examination but did not perform the requested autopsy. He noted that Mr. Murray's left hand was "clean and free of any debris," but his right hand was "caked in blood." *Spoliation Order*, 146 Fed. Cl. at 732. He found that the cause of Mr. Murray's death was a gunshot wound to the left of his skull and opined that manner of his death was suicide.

A September 2008 FBI memorandum recommended closing the investigation of Mr. Murray's death. The memorandum stated that "[d]ue to an active civil suit involving [redacted] and the [Vernal City Police Department]," the two .40 caliber shell casings and two .380 caliber shell casings had been provided to the Vernal City Police Department. J.A. 361–62. The memorandum noted that no items other than the Hi-Point .380 remained in FBI evidence. A few months later, in December 2008, the FBI turned the Hi-Point .380 over to the U.S. Marshals Service, which destroyed the weapon.

In July 2009, Mr. Murray's parents sued state and local officers for alleged violations of 42 U.S.C. § 1983, assault and battery, wrongful death, and intentional infliction of emotional distress. The District of Utah granted summary judgment in favor of the defendants, and the Tenth Circuit affirmed. *Jones v. Norton*, 3 F. Supp. 3d 1170 (D. Utah 2014), *aff'd*, 809 F.3d 564 (10th Cir. 2015).

In April 2013, Mr. Murray's parents filed this suit in the Claims Court. They seek compensation for Mr.

Murray's death under the "bad men" provision in the March 2, 1868 Treaty with the Ute. The "bad men" provision requires the United States to compensate individual members of the Ute Tribe for losses incurred if "bad men among the whites or among other people, subject to the authority of the United States, shall commit any wrong" on the tribal member's person or property. Treaty with the Ute, art. VI, Mar. 2, 1868, 15 Stat. 619, 620.

In July 2015, the Claims Court granted the United States' motion to dismiss for failure to state a claim. *Jones v. United States* (*Jones I*), 122 Fed. Cl. 490, 522, 529–30 (2015), *vacated and remanded*, 846 F.3d 1343 (Fed. Cir. 2017). The Claims Court held, *inter alia*, that the doctrine of issue preclusion prevented relitigation of Mr. Murray's parents' assertions of spoliation and the ultimate issue of whether Officer Norton killed Mr. Murray. *Id.* at 490, 523–25, 529–30. We vacated the Claims Court's issue preclusion decision and remanded for consideration of Mr. Murray's parents' spoliation assertions. *Jones II*, 846 F.3d 1343. We explained that "[t]he absence of the federal officers as defendants in the district court litigation fundamentally undermines the preclusive effect of several of the district court's ultimate conclusions, including the key conclusion that Murray shot himself." *Id.* at 1363. We noted that a spoliation sanction might provide sufficient evidence for Mr. Murray's parents' claims to survive a motion for summary judgment. We noted that, if the Claims Court determined that "the appropriate [spoliation] sanctions would not change the evidentiary landscape for particular issues, the [Claims Court] may reconsider the application of issue preclusion." *Id.* at 1363–64.

On remand, the Claims Court granted-in-part and denied-in-part Mr. Murray's parents' motion for spoliation sanctions. *Spoliation Order*, 146 Fed. Cl. 726. It found that the United States spoliated the Hi-Point .380 handgun. As a sanction for that spoliation, the Claims Court forbade the United States from relying on any facts related

to the .380 handgun—including the fact that a third shell casing was not ejected, and the presence or absence of fingerprints or "blowback" on the gun—as evidence supporting its claim that Mr. Murray shot himself. The Claims Court did not mandate that negative inferences should be drawn from the United States' spoliation of evidence.

The Claims Court found that the United States did not spoliate any other evidence. It found that the federal government did not control other evidence, including Officer Norton's gun, clothing, person, or vehicle; Mr. Murray's person or clothing; and the shooting scene, because federal agents never possessed the evidence. It also found that the local officers' "grossly inappropriate" treatment of Mr. Murray's body at the hospital and mortuary "support a factual finding that the federal agents did not preserve Mr. Murray's hands and clothing for forensic testing" but "did not otherwise affect evidence relevant to the plaintiffs' claims about the cause of Mr. Murray's death." *Id.* at 737.

Then, on July 8, 2020, the Claims Court granted the United States' motion for summary judgment. The Claims Court found that the spoliation of the Hi-Point .380 "has not changed the evidentiary landscape for the central issues relevant in this case decided by the district court, such as the cause of Mr. Murray's death." *Issue Preclusion Order*, 149 Fed. Cl. at 349. Thus, the Claims Court concluded, issue preclusion applied to those central issues.

Mr. Murray's parents appeal aspects of both the Claims Court's spoliation decision and its summary judgment decision. We have jurisdiction to hear their appeal under 28 U.S.C. § 1295(a)(3).

## II.    DISCUSSION

### A. Spoliation

"[A] party can only be sanctioned for destroying evidence if it had a duty to preserve it." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) (quoting

*Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 216 (S.D.N.Y. 2003)).  A duty to preserve evidence arises when a party knows or reasonably should know that evidence in its control may be relevant to a reasonably foreseeable legal action.  *See id.*  Spoliation is the breach of the duty to preserve evidence, either through destruction of evidence or through failure to properly preserve it.  *Id.* (citing *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)).

We review the Claims Court's evidentiary decisions, including determinations that a party has breached their duty to preserve evidence, for abuse of discretion.  *See Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356, 1365 (Fed. Cir. 2016).  The Claims Court abuses its discretion where (1) its decision is "clearly unreasonable, arbitrary, or fanciful"; (2) its decision is "based on an erroneous conclusion of the law"; (3) its factual findings are clearly erroneous; or (4) the record lacks evidence on which the court "rationally could have based its decision."  *Id.* (quoting *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1341 (Fed. Cir. 1999)).

Mr. Murray's parents identify two errors in the Claims Court's spoliation order.  First, they assert that the Claims Court erred in finding that the government did not spoliate any evidence other than the Hi-Point .380 handgun.  Second, they argue that the Claims Court abused its discretion in its choice of sanction for the government's spoliation of the Hi-Point .380 handgun.  We address each issue in turn.

1.  Spoliation of Evidence Other than the Handgun

Mr. Murray's parents argue that the Claims Court improperly found that the government did not spoliate any evidence other than the Hi-Point .380 handgun.  They specifically argue that the Claims Court erred in holding that the government does not control evidence that it does not physically possess—a standard different than that applied to all other non-governmental civil litigants.  They argue

that key evidence, including evidence from Mr. Murray's body, Officer Norton's gun, and Officer Norton's clothing, was in the government's control and that the government had a duty to preserve that evidence.

We agree that the Claims Court erred in applying a different definition of "control" to the government than that applied to all other civil litigants. By defining "control" to require that the government physically possess evidence rather than merely have a right to obtain or control that evidence, the Claims Court held the government to a lesser duty to preserve than other civil litigants. But, as the Claims Court has previously explained, the government has the same duty to ensure that relevant evidence is preserved as any litigant. *United Med. Supply Co. v. United States*, 77 Fed. Cl. 257, 274 (2007). Law enforcement officers are not held to a lower duty to preserve evidence than other civil litigants. Like any other civil litigant, the government "controls" evidence under the duty to preserve where it has a legal right to obtain or control that evidence.

Physical possession is not a prerequisite to the imposition of a duty to preserve. *See, e.g.*, *Silvestri*, 271 F.3d at 591 (explaining how the duty to preserve evidence applies to evidence to which the party has access but does not own). In fact, in other cases, the Claims Court has found that a party with a legal right to obtain or control relevant evidence has a duty to preserve that evidence, even where the party does not actually possess the evidence. *See Spoliation Order*, 146 Fed. Cl. at 738. It departed from that precedent in this case, holding that federal agents did not control evidence that they did not physically possess. *Id.* The Claims Court noted that federal agents had jurisdiction over the investigation into Mr. Murray's death and, "[s]ubject to constitutional requirements and limits," could have "searched or collected elements of the shooting scene," "seized Officer Norton's gun and clothes for testing and searched Officer Norton's vehicle for Mr. Murray's blood," or "detained Officer Norton to prevent him from tampering

with other shooting-scene elements." *Id.* at 739. But the court ultimately held that "the federal agents' limited authority to investigate and collect evidence of a crime" is not "the property-like right-to-control sufficient to find spoliation." *Id.* at 738

The government argues that the Claims Court correctly found no spoliation of any evidence other than the Hi-Point .380 handgun for five reasons. First, the government argues that the Claims Court correctly required physical possession of the evidence as a prerequisite to a duty to preserve. Second, the government argues that it was under no obligation to collect any particular evidence—any investigation into the crime scene was purely discretionary. Third, the government argues that its jurisdiction over the investigation did not provide it with control over the allegedly spoliated evidence. Fourth, the government argues that, despite ordering an autopsy of Mr. Murray's body, it never exercised control over his body because the Medical Examiner did not comply with its request and never performed an autopsy. It further argues that no allegedly spoliated evidence on Mr. Murray's body is relevant to Mr. Murray's parents' claims. Finally, the government argues that, even if the allegedly spoliated evidence was under its control, it had no duty to preserve that evidence because the FBI did not reasonably foresee civil litigation during its investigation. We have already explained that the Claims Court erred in requiring physical possession as a prerequisite to a duty to preserve. Thus, the government's first argument fails. We address the government's remaining four arguments in turn.

The government's second argument—that it had no duty to preserve evidence because it had no obligation to collect any evidence—conflates the minimum standards required in conducting a criminal investigation with the duty to preserve evidence applicable in this civil suit. In a criminal prosecution, the Due Process Clause does not "impos[e] on the police an undifferentiated and absolute duty to

retain and to preserve all material that might be of conceivable evidentiary significance." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). The government and the Claims Court cite to several criminal and habeas corpus cases, including *Youngblood*, in support of the proposition that law enforcement does not control evidence that it is not required to collect and preserve under the Due Process Clause. These cases principally address *constitutional* requirements on law enforcement, which set a floor on collection duties but do not preclude additional non-constitutional requirements such as anti-spoliation duties in a civil case as a matter of judicial policy. Evidence in the government's control for purposes of civil litigation does not mean evidence that the government had a legal *requirement* to obtain—it is evidence that the government had a legal *right* to obtain. And, to the limited extent the sources on which the government relies involve the executive branch's non-constitutional policy choices, the choices are keyed to the mix of considerations relevant to *a criminal prosecution*. Such choices do not control the judicial system's policy choices that define the duty to preserve evidence in *a civil case*. The government has not given us persuasive reasons to exempt it from the ordinary civil-case rules imposing a duty to preserve relevant evidence in its control for reasonably foreseeable civil litigation.

Similarly unpersuasive are the government's citations to cases addressing whether the United States is immune to suit under the Federal Tort Claims Act for law enforcements' discretionary actions, such as *Gonzalez v. United States*, 814 F.3d 1022 (9th Cir. 2016). *Gonzalez* and other Federal Tort Claims Act cases raised by the government, like the criminal cases and habeas corpus cases cited by the government and the Claims Court, address what steps law enforcement is *required* to take—not what evidence law enforcement has a *right* to control. Those Federal Tort Claims Act cases, thus, provide no guidance in our application of the civil-litigation duty to preserve evidence.

The government and the Claims Court identify four civil cases from other circuit and district courts that do not arise in the Federal Tort Claims Act context. These cases, as we explain here, either say nothing about the government's duty to preserve evidence for civil litigation, are unpersuasive, or support our holding that the normal duty to preserve evidence applies to the government.

The government cites *Cunningham v. City of Wenatchee*, in which the Ninth Circuit held that a police officer's failure to record exculpatory evidence in a criminal investigation was not a civil rights violation under 42 U.S.C. § 1983. 345 F.3d 802, 812 (9th Cir. 2003). Although *Cunningham* was a civil case, the issue there was whether police had violated the Due Process Clause by failing to gather and preserve exculpatory evidence in their criminal investigation. *Id.* The Ninth Circuit correctly applied the *Youngblood* standard applicable to allegations of a denial of due process stemming from the collection and preservation of evidence in criminal investigations and prosecutions. But the court did not consider the issue of spoliation of evidence. A party may breach its duty to preserve evidence for civil litigation even where that failure to preserve evidence does not rise to the level of a due process violation. Thus, *Cunningham* provides no guidance as to the government's duty to preserve evidence in civil cases.

The government also cites *Howell v. Earl*, where a magistrate judge in the District of Montana recommended against finding that a highway patrol trooper spoliated evidence when he did not record his conversation with a woman who later sued the state. No. 13-cv-48-BU-DWM-JCL, 2014 WL 2761352 (D. Mont. June 3, 2014), *report and recommendation adopted*, 2014 WL 2761342 (D. Mont. June 18, 2014). The magistrate judge stated that "[l]aw enforcement officers have no affirmative legal duty to gather and collect evidence, but are obligated to preserve evidence once it is gathered." *Id.* at *1. No party objected to the magistrate's recommendation, which the district

court judge adopted after finding no clear error in the magistrate's spoliation analysis. *Howell*, 2014 WL 2761342, at *1. This non-precedential district court decision is not binding on this court. As we have already explained, control requires only a legal *right* to obtain evidence, not a legal *requirement* to obtain evidence. Thus, we decline to follow the example set by the District of Montana in that single non-precedential order.

In addition to the cases cited by the government in its brief on appeal, the Claims Court identified two cases where other courts have denied spoliation sanctions against the government in civil cases, *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840 (10th Cir. 2005), and *Tchatat v. O'Hara*, 249 F. Supp. 3d 701 (S.D.N.Y. 2017), *objections overruled*, No. 14 CIV. 2385 (LGS), 2017 WL 3172715 (S.D.N.Y. July 25, 2017), *aff'd sub nom., Tchatat v. City of New York*, 795 F. App'x 34 (2d Cir. 2019). The Claims Court read those cases as establishing a rule that courts "refuse to use spoliation sanctions to impose on law enforcement a duty to collect evidence." *Spoliation Order*, 146 Fed. Cl. at 740. But those cases do not stand for that proposition. Rather, the courts in those cases applied the familiar duty to preserve that applies to all civil litigants in the applicable jurisdictions and, based on the specific facts of the cases before them, did not abuse their discretion in denying spoliation sanctions.

The Claims Court mischaracterized the Tenth Circuit's decision in *Trentadue* by conflating the evidentiary ruling of spoliation with the tort of intentional destruction of evidence. The Claims Court said that "the Tenth Circuit affirmed the trial court's holding that the prison officials' next-day cleaning and repainting of the inmate's cell did not constitute intentional destruction of evidence that could be sanctioned as spoliation." *Id.* But that is not what the Tenth Circuit held. Rather, it affirmed the trial court's holding that, under Oklahoma law, intentional destruction of evidence is not a recognized tort. *Trentadue*, 397 F.3d at

861–62.  It separately affirmed the trial court's selection of a sanction for the loss of evidence.  *Id*. at 862–63.

The district court in *Trentadue* also recognized that its evidentiary rulings were separate from its holding on tort liability.  It noted that, while Oklahoma does not recognize the tort of intentional destruction of evidence, "[t]his is not to suggest, however, that the court has not properly taken into account plaintiffs['] claims that certain important items of relevant evidence in this case were destroyed, lost or shown to be inaccurate." *Estate of Trentadue v. United States*, No. CIV-97-849-L, 2001 U.S. Dist. LEXIS 25864, at *33 (W.D. Okla. May 1, 2001).  In fact, the district court did apply sanctions for the loss of evidence, stating that, "[w]here appropriate, the court has drawn reasonable inferences from the circumstances surrounding lost or inaccurate evidence in deciding what weight should be given to that evidence." *Id.*  It just did not apply an adverse inference.  *See id.*

The Tenth Circuit, moreover, did not import the *Youngblood* standard to the civil-litigation spoliation context as the Claims Court did here.  Rather, it seems to have applied the familiar civil litigation spoliation standard, which, under Oklahoma law, permits a sanction of an adverse inference "only in cases of willful destruction or suppression." *Trentadue*, 397 F.3d at 864 (quoting *Beverly v. Wal-Mart Stores, Inc.*, 3 P.3d 163, 165 (Okla. Civ. App. 1999)) (internal quotation marks and brackets omitted).  *Trentadue*, therefore, does not support the Claims Court's departure from the familiar duty to preserve evidence for civil litigation.

The Claims Court also mischaracterized the holding in *Tchatat*, where a magistrate judge found that the New York Police Department did not spoliate evidence from the scene of an alleged shoplifting that it failed to collect, or collected but failed to preserve.  The Claims Court stated that the *Tchatat* court held "that the Supreme Court's

limits on law enforcement's *Brady* obligations in *Youngblood* precluded the court from finding a spoliation-related duty for the officers"[3] to collect and preserve evidence. *See Spoliation Order*, 146 Fed. Cl. at 740. To the contrary, however, the district court in *Tchatat* held law enforcement to the familiar duty to preserve evidence. In doing so, it simply found that police officers had no duty to preserve the allegedly spoliated evidence at issue because Mr. Tchatat's later civil litigation was not "reasonably fore-seeable" while they had control of the evidence. *Tchatat*, 249 F.Supp.3d at 708–09.

The district court's subsequent discussion of law enforcement's *Brady* obligations is dicta. Mr. Tchatat argued that the police's duty to collect and preserve evidence in his criminal prosecution transferred to his later civil suit. *Id.* at 709. In response to this argument, the district court noted that, "even if [it] were to import the *Brady* and related obligations arising from criminal prosecutions into the spoliation analysis," those obligations only required disclosures (and therefore preservation) of evidence for use at the criminal trial. *Id.* at 709–10. The district court explained that "any purported preservation obligation was extinguished on acquittal, long before [Mr. Tchatat's civil] action was brought," and thus "no spoliation sanction can issue." *Id.* at 710. Thus, contrary to the Claims Court's representation, the district court in *Tchatat* did not "apply[] *Youngblood* to limit the application of spoliation sanctions to law enforcement in a civil case." *See Spoliation Order*, 146 Fed. Cl. at 739.

We have found no cases in which any of our sister circuits have adopted the *Youngblood* standard to lessen the

---

[3]    In *Brady v. Maryland*, the Supreme Court held that, in a prosecution, the Due Process Clause requires the government to turn over material evidence in its possession that is favorable to the accused. 373 U.S. 83, 87 (1963)

government's duty to preserve evidence that may be relevant to reasonably foreseeable civil litigation. The few relevant cases identified by the parties and the Claims Court, with the exception of the District of Montana's non-precedential order in *Howell*, apply the same duty to preserve evidence on law enforcement as on every other civil litigant. We will not depart from that pattern and exempt law enforcement from its duty to preserve relevant evidence within its control where litigation is reasonably foreseeable.

The Claims Court expressed concern that applying the familiar duty to preserve evidence would create an "open-ended duty for law enforcement to investigate to future litigants' standards." *Spoliation Order*, 146 Fed. Cl. at 739. The Claims Court's fears are unfounded as "control" is not the sole requirement of a party's duty to preserve—the duty to preserve is further limited in scope to relevant evidence and limited in time to when litigation becomes reasonably foreseeable. *See Micron*, 645 F.3d at 1320 (The "obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation . . . as for example when a party should have known that the evidence may be relevant to future litigation." (quoting *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998))). Moreover, as we explain below, law enforcement's "control" over an investigation scene is not unlimited and, therefore, neither is its duty to preserve evidence on that investigation scene.

We now address the government's third argument—that its jurisdiction over the investigation did not provide it with control over the allegedly spoliated evidence. As we have already explained, a party, including the government, controls evidence under the duty to preserve where it has a legal right to obtain or control that evidence. Thus, the government may have control over evidence where it has jurisdiction to investigate an incident if its jurisdiction gives it the right to obtain or control that evidence. We stop

short of holding that the government always controls all evidence on an investigation scene. The Fourth Amendment of the United States Constitution constrains the government's legal right to obtain or control evidence in an investigation. As the Claims Court noted, the extent of the government's control over an investigation scene is dependent on its suspicion of a crime. *Spoliation Order*, 146 Fed. Cl. at 739. The government could not have, for example, taken Officer Norton into custody absent probable cause. *See Dunaway v. New York*, 442 U.S. 200, 216 (1979). The inverse of this statement is also true: If the FBI had probable cause, it had a legal right to take Officer Norton into custody, as well as control over the evidence on his person.

Mr. Murray's parents urge us to find that the government had control over all allegedly spoliated evidence. While it is true that the government's right to control evidence extends well beyond the Hi-Point .380 handgun, the extent of its control and other elements of the spoliation standard (such as reasonable foreseeability of litigation) are factual questions that we leave for the Claims Court to decide in the first instance.

Turning to the government's fourth argument—that the government lacked control over Mr. Murray's body despite ordering an autopsy—we similarly remand this factual issue for the Claims Court to decide as necessary in the first instance.

We are unpersuaded by the government's alternative argument that there was no spoliation of evidence that could have been obtained from Mr. Murray's body because, as the Claims Court found, the mishandling of the body was irrelevant. It is true that the Claims Court found that the mistreatment of Mr. Murray's body that occurred when officers photographed themselves inserting their fingers in the deceased Mr. Murray's head wound, stabbed him in the heart with a syringe, and cut open his neck—"while grossly inappropriate—did not otherwise affect evidence relevant

to the plaintiffs' claims about the cause of Mr. Murray's death" and, thus, is not a basis for spoliation sanctions. *Spoliation Order*, 146 Fed. Cl. at 737. But Mr. Murray's parents' spoliation allegations, as they relate to Mr. Murray's body, are not limited to those grossly inappropriate acts. Mr. Murray's parents also allege spoliation stemming from the FBI's failure to enforce its request for an autopsy and failure to bag Mr. Murray's hands. Appellant's Princ. Br. 24–25. The Claims Court made no relevancy determinations as to that evidence and must decide on remand whether the government spoliated that evidence.

As to the government's fifth argument—that it could not reasonably foresee the prospect of civil litigation while it had control over the investigation scene—we think it advisable to remand for further consideration of this issue. The government asserts that "when the FBI was at the scene and able to collect evidence, future civil litigation over the manner of Mr. Murray's death was not reasonably foreseeable." Appellee's Br. 28. The Claims Court rejected the government's similar argument that litigation was not reasonably foreseeable when the gun was destroyed[4]— finding that "[l]itigation involving the gun was reasonably foreseeable when the gun was destroyed" in December 2008 and that, " 'in light of the seriousness of the incident and the involvement of officers on the Reservation where they did not have jurisdiction, litigation could reasonably be expected.' " *Spoliation Order*, 146 Fed. Cl. at 741 (quoting *Jones v. Norton*, No. 2:09-CV-730-TC, 2014 WL 909569, at *7 (D. Utah Mar. 7, 2014), *aff'd,* 809 F.3d 564 (10th Cir. 2015)). It is not clear whether the Claims Court determined that litigation was reasonably foreseeable only as of

---

[4]    The government does not appeal the Claims Court's finding that the litigation was reasonably foreseeable as of December 2008 and we do not disturb that finding.

December 2008, or whether litigation was reasonably fore-seeable earlier in the investigation as well. We remand for the Claims Court to clarify, as necessary, whether litigation was reasonably foreseeable while the government had control (as we define it here) over any allegedly spoliated evidence other than the spoliated Hi-Point .380 handgun.[5]

## 2. Spoliation Remedy

We turn now to the sanction imposed by the Claims Court for the government's spoliation of the Hi-Point .380 handgun with which, the government asserts, Mr. Murray shot himself. The Claims Court's sanction prohibited the government from relying on any facts related to the .380 handgun—including the fact that a third shell casing was not ejected and the presence or absence of fingerprints or blowback on the gun—as evidence supporting its claim that Mr. Murray shot himself with that gun. The Claims Court limited the sanction to the government's principal case. *Spoliation Order*, 146 Fed. Cl. at 743. It explicitly reserved the issue of whether the government may use the spoliated

---

[5]    The Claims Court should consider all evidence per-taining to the reasonable foreseeability of litigation, includ-ing its factual finding that litigation could reasonably be expected due to " 'the seriousness of the incident and the involvement of officers on the Reservation where they did not have jurisdiction,' " which we do not disturb. *See Spoliation Order*, 146 Fed. 32 Cl. at 741 (quoting *Jones*, 2014 WL 909569, at *7, *aff'd,* 809 F.3d 564). This inquiry would necessarily include all information the federal officers gleaned from their observations at the scene, morgue, and coroner's office, including the coroner's failure to carry out the ordered autopsy. Reasonable foreseeability "is an ob-jective standard, asking not whether the party in fact rea-sonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Micron*, 645 F.3d at 1320.

evidence to rebut any arguments presented by Mr. Murray's parents based on the gun. *Id.* at 743 n.9. The Claims Court refused to adopt any negative inferences stemming from the government's spoliation of the gun.

Mr. Murray's parents argue that the district court should have imposed a harsher sanction. We agree that the Claims Court abused its discretion. Although the Claims Court exercises considerable discretion in imposing sanctions, we find that its choice of sanction here is futile. Considering the import of the Hi-Point .380 handgun to Mr. Murray's parents' case, a harsher sanction is required.

As the Second and Fourth Circuits have noted, an appropriate sanction for spoliation "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Silvestri*, 271 F.3d at 590 (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)); *accord Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) ("[S]anctions for discovery abuses are intended to prevent unfair prejudice to litigants and to [ensure] the integrity of the discovery process." (citation omitted)). That is, an appropriate sanction should be designed to:

> (1) deter parties from engaging in spoliation;
>
> (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and
>
> (3) restore "the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."

*West*, 167 F.3d at 779 (quoting *Kronisch*, 150 F.3d at 126). We agree with those circuits. A sanction is futile when it does not serve those prophylactic, punitive, and remedial rationales, and the imposition of a futile sanction is an abuse of discretion. *See Flury*, 427 F.3d at 940, 943 (reversing the district court's imposition of a lesser sanction because the district court "failed to impose meaningful

sanctions for plaintiff's spoliation of critical evidence" and holding that "the extraordinary nature of plaintiff's actions coupled with extreme prejudice to the defendant warrants dismissal"); *see also Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006) (affirming dismissal where lesser sanctions, like the exclusion of evidence or a jury instruction creating an evidentiary presumption, would be "futile").

The Claims Court's sanction does not serve the prophylactic, punitive, or remedial rationales underlying the spoliation doctrine. Even before the Claims Court imposed its sanction, the government did not rely on the spoliated gun or any facts related to it. Indeed, the 2015 Claims Court decision in *Jones I* granting summary judgment to the government based on issue preclusion did not rely on the evidence forbidden by the sanction—fingerprints, blowback, and other evidence which may have been found on the spoliated gun. *See Jones I*, 122 Fed. Cl. at 523–30. Nor did Officer Norton rely on that prohibited evidence in his motion for summary judgment in the district court. *Issue Preclusion Order*, 149 Fed. Cl at 353. These opinions gave the United States a roadmap by which to prevail in this case without relying on the prohibited evidence. By granting a sanction preventing the United States from relying on evidence on which it never needed to rely in the first place, the Claims Court crafted a meaningless sanction that fails to deter the government from engaging in spoliation and places the risk of an erroneous judgment on Mr. Murray's parents. It is no sanction at all to prevent a spoliator from relying on evidence which it does not need to support its case.

The meaninglessness of the Claims Court's sanction is confirmed by the loopholes in that sanction. Although it prevented the government from relying on the gun itself or facts related to that gun such as fingerprints or blowback, the Claims Court's sanction does not prevent the government from relying on FBI agent testimony regarding the spoliated handgun or photographs of the spoliated

handgun.  In fact, the Claims Court cited that evidence in its recitation of the facts:

> Agent Ashdown photographed a spent shell-casing that apparently had failed to eject properly, "jammed" inside the .380 handgun.  The FBI retained possession of the .380 handgun.  Agent Ashdown did not request a test firing of the .380 handgun, later testifying that the only purpose of test firing it would have been to confirm that it functioned and had been fired.

*Issue Preclusion Order*, 149 Fed. Cl at 342 (internal citations omitted).  By allowing the government to rely on its own testimony regarding the evidence it spoliated, the Claims Court effectively permits the government to sidestep the court's already weak sanction.  This non-sanction serves neither the prophylactic nor punitive rationales of an appropriate spoliation sanction.

Nor does the Claims Court's sanction serve to remedy the prejudice inflicted on Mr. Murray's parents by the spoliation of the Hi-Point .380 handgun.  The Claims Court found that Mr. Murray's parents failed to show that the government's destruction of the gun prejudiced them because they failed to provide more than speculation as to what evidence might have been found on the gun.  The Claims Court held Mr. Murray's parents to an impossible standard.  Mr. Murray's parents could not provide anything more than speculation as to what evidence might have been found on the Hi-Point .380 handgun *because the government destroyed the gun along with any evidence Mr. Murray's parents could have collected from it.*  As we have previously explained, a party may satisfy its burden to show prejudice by coming forward "with plausible, concrete *suggestions* as to what [the destroyed] evidence *might have been.*"  *Micron*, 645 F.3d at 1328 (emphasis in original) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 80 (3d Cir. 1994)).  In this case, plausible, concrete

suggestions must suffice to show prejudice lest the government be permitted to avoid spoliation sanctions by virtue of the spoliation itself.

Mr. Murray's parents came forward with plausible concrete suggestions as to what evidence might have been found on the spoliated gun. For example, they suggested that forensic testing of the gun might have shown the presence of Officer Norton's fingerprints. The gun may also have shown the presence or absence of blowback, or fingerprints indicating in which hand Mr. Murray, who is right-handed, held the gun. That this suggested evidence is both plausible and concrete is proven by the Tenth Circuit's reliance on similar evidence in affirming summary judgment in favor of Officer Norton and other defendants. The Tenth Circuit held that "there is no genuine dispute of fact that the shooter was anyone but Murray himself," based, in part, on the fact that there was no blowback observed on Officer Norton. *Jones*, 809 F.3d at 575. If absence of blowback on Officer Norton is evidence that he did not shoot Mr. Murry, it is a plausible and concrete suggestion that absence of blowback on the Hi-Point .380 handgun is evidence that it was not used to shoot Mr. Murray. Had the government not destroyed the gun, these suggestions may have been evidence that constituted a key part of Mr. Murray's parents' case. That the government's spoliation of the gun deprived them of this potential evidence is prejudice.

Although a sanction preventing the spoliator from relying on the evidence they destroyed might be appropriate in other cases, it is not appropriate in this case because it serves none of the rationales underlying the spoliation doctrine. We, thus, conclude that the Claims Court abused its discretion in crafting its sanction for the government's spoliation of the Hi-Point .380 handgun, and we remand for consideration of a more appropriate sanction. Specifically, we remand for the Claims Court to determine the exact bounds of the appropriate remedy, such as an adverse inference or inferences, that should apply to any spoliated

evidence in this case. On remand, the Claims Court should also consider whether the government should be permitted to rely on secondary evidence related to the spoliated gun in the form of photographs and testimony where it has destroyed the primary evidence.

### B. Issue Preclusion

We review the Claims Court's summary judgment decision *de novo*. As we explained in *Jones II*, issue preclusion is available as a defense where the following four elements are met:

> 1. The issue previously decided is identical with the one presented in the action in question.
>
> 2. The prior action has been finally adjudicated on the merits.
>
> 3. The party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication.
>
> 4. The party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Jones II*, 846 F.3d at 1361 (citing *Park Lake Res. Ltd. Liab. Co. v. U.S. Dep't of Agric.*, 378 F.3d 1132, 1136 (10th Cir. 2004)). As in our prior decision, only the first and fourth factors are under dispute.

In *Jones II*, we instructed the Claims Court to consider whether any spoliation sanctions it decided to impose would "change the evidentiary landscape." *Id.* at 1363–64. We explained that, if its spoliation sanctions did not change the evidentiary landscape, the Claims Court could consider anew the application of issue preclusion. *Id.* But, if its spoliation sanctions changed the evidentiary landscape, we instructed the Claims Court to "independently consider [Mr. Murray's parents'] substantive allegations of bad men violations." *Id.* at 1364.

The Claims Court found that the sanction it devised for the "spoliation of the .380 handgun reduces the evidence available to the United States to argue that Mr. Murray shot himself, but it does not augment the evidence that is available to the plaintiffs . . . to prove that Officer Norton shot Mr. Murray." *Issue Preclusion Order*, 149 Fed. Cl. at 353. It thus concluded that the evidentiary landscape was unchanged, as Mr. Murray's parents were able to provide no new evidence of their son's alleged murder. Mr. Murray's parents argue on appeal that the Claims Court's determination that the spoliation of the handgun did not change the evidentiary landscape is incorrect. We agree. There was a change in the evidentiary landscape, and the Claims Court committed two errors in coming to the opposite conclusion.

First, the Claims Court misinterpreted our instruction to consider whether its sanction "change[s] the evidentiary landscape" when it used the evidence on which the district court based its summary judgment decision as the baseline against which any change in the evidentiary landscape should be measured. *Issue Preclusion Order*, 149 Fed. Cl. at 353 (noting that Officer Norton's motion for summary judgment in the district court did not rely on the spoliated gun). The proper baseline against which to measure a change in the evidentiary landscape is not the evidence relied on in the district court decision, but the evidence as it existed before the spoliation. The district court case was filed after the gun was destroyed, and, thus, the district court could not rely on the gun *as it had already been destroyed*. Although a spoliation sanction concerning some other, less critical, evidence may not have changed the evidentiary landscape—spoliation of the alleged suicide weapon did.

Second, as we have already explained, the Claims Court abused its discretion in awarding a sanction that did not augment the evidence available to Mr. Murray's parents. Had the Claims Court measured the change in the

evidentiary landscape from a time before the spoliation of the Hi-Point .380 handgun, or had it applied an appropriate sanction augmenting the evidence available to Mr. Murray's parents, it would have found that the spoliation of the gun changed the evidentiary landscape.  Because the evidentiary landscape is changed, we reverse the Claims Court's grant of summary judgment and remand for it to "independently consider [Mr. Murray's parents'] substantive allegations of bad men violations."  *See Jones II*, 846 F.3d at 1364.

### III.    CONCLUSION

For the foregoing reasons we *vacate* the Claims Court's spoliation decision as to all evidence other than the Hi-Point .380 handgun and as to the sanction for the spoliation of the Hi-Point .380 handgun.  We *remand* the spoliation decision for consideration in accordance with this opinion. We *reverse* the Claims Court's summary judgment decision and *remand* for further proceedings.

**VACATED-IN-PART, REVERSED-IN-PART, AND REMANDED**

COSTS

No costs.